NO. 24-14058-JJ

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff/appellee,*
v.

MAXON ALSENAT,
              *Defendant/appellant.*

On Appeal from the United States District Court
For the Southern District of Florida

BRIEF OF THE APPELLANT
MAXON ALSENAT

HECTOR A. DOPICO
  Federal Public Defender
EBONI BLENMAN
  Assistant Federal Public Defender
  Attorney for Appellant
  150 West Flagler Street, Suite 1700
  Miami, Florida 33130
  Telephone No. (305) 530-7000

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

## United States v. Maxon Alsenat
## Case No. 24-14058-JJ

Appellant, Maxon Alsenat files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1:

Alsenat, Maxon, Defendant

Augustin-Birch, Panayotta D., U.S. Magistrate Judge

Blenman, Eboni, Assistant Federal Public Defender

Alsenat, Bruce, Assistant United States Attorney

Caruso, Michael, Former Federal Public Defender

**Davis, Michael S, Assistant United States Attorney**

Day, Timothy, Assistant Federal Public Defender

Diaz Espinosa, Stefan Rafael, Assistant United States Attorney

Dopico, Hector, A., Federal Public Defender

Gayles, Darrin P., United States District Judge

Klco, Sara Michele, Assistant United States Attorney

Lapointe, Markenzy, Former United States Attorney

Leibowitz, David S., United States District Judge

Matzkin, Daniel, Chief, Appellate Division, Assistant United States Attorney

**O'Byrne, Hayden P., United States Attorney**

Strauss, Jared M., United States Magistrate Judge

United States of America, Plaintiff/Appellee

Valle, Alicia O., United States Magistrate Judge

/s/ Eboni Blenman
Eboni Blenman

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Alsenat respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................i

TABLE OF CITATIONS ...................................................... iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..........................................................................iv

STATEMENT OF THE ISSUES..............................................1

STATEMENT OF THE CASE ................................................2

    Course of Proceedings and Disposition in the District Court .........2

    Statement of Facts ............................................................4

    Motion to Dismiss

    Plea of Guilty.................................................................. 11

    Standards of Review......................................................13

SUMMARY OF THE ARGUMENT .........................................14

ARGUMENT AND CITATIONS OF AUTHORITY .............................16

I.  The Court should vacate Mr. Alsenat's conviction because, after *Bruen*, 18 U.S.C. § 922(o)(1) violates the Second Amendment as applied to him

    A. *Bruen* Step One: The Second Amendment's "plain text" protects Mr. Alsenat's possession of a machinegun outside the home

    B. *Bruen* Step Two: There is no historical tradition of firearm regulation in this country that would justify categorical

prohibition of mere possession of a machine gun, whether generally or as to Mr. Alsenat

1. The government bears the burden of showing a tradition

2. The Government did not and cannot meet its burden of establishing a sufficient historical analog

3. All the Court needs to find here is that there is no historical tradition of a categorical weapons ban categorically disarming individuals *like Mr. Alsenat*

II.    18 U.S.C. § 922(o)(1) is facially unconstitutional.

CONCLUSION ...................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................31

CERTIFICATE OF SERVICE..............................................................32

# TABLE OF CITATIONS

Cases

*District of Columbia v. Heller,*

554 U.S. 570 (2008) ......................................... 5, 6, 7, 16, 17, 18, 19, 22

*McGuire v. Marshall,*

50 F.4th 986 (11th Cir. 2022) ...............................................................30

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*

597 U.S. 1 (2022)... 4, 5, 6, 7, 8, 11, 14, 16, 17, 22, 23, 24, 25, 26, 27, 28, 29

*Simpson v. State,*

13 Tenn. 356 (1833) ...............................................................................27

*United States v. Fleury,*

20 F.4th 1353 (11th Cir. 2021) ............................................................13

*United States v. Miller,*

307 U.S. 174 (1939) .................................................................................7

*United States v. Morgan,*

2024 WL 3936767 ..................................................................................27

*United States v. Pugh,*

90 F.4th 1318 (11th Cir. 2024) ............................................................30

*United States v. Salerno,*

481 U.S. 739 (1987)..................................................................................30


**Statutes**

Title 18, United States Code, Section 922(o)(1).. 1, 5, 6, 14, 15, 16, 23, 31

Title 18, United States Code, Section 921(a)(24)...............................3, 19

Title 18, United States Code, Section 922(o)(l).......................................3

Title 26, United States Code, Section 5845(b)..........................3, 4, 19, 20


**Constitutional Provisions**

U.S. Const. amend. II..............................................................5,16,17

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States. The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on December 10, 2024 [DE 89] from the final judgment and commitment entered on November 26, 2024 [DE 87], which disposes of all claims between the parties to this cause.

# STATEMENT OF THE ISSUES

Whether, pursuant to the Second Amendment analysis dictated by *Bruen*, 18 U.S.C. § 922(o)(1) is unconstitutional, either facially or as applied to Mr. Alsenat.

## STATEMENT OF THE CASE

Maxon Alsenat, the appellant, was the defendant in the district court and will be referred to by name. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the document number as set forth in the docket sheet.

Mr. Alsenat has completed the carceral portion of his sentence. He is currently on supervised release.

### Course of Proceedings and Disposition in the District Court

### Statement of Facts

In early June 2023, Maxon Alsenat unknowingly began communicating with an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF") after answering a phone call intended for a third party who was then under ATF investigation. (DE 88 ¶ 4). In the days that followed, the undercover agent and Mr. Alsenat—who had no prior felony convictions and was not barred from possessing a firearm—exchanged phone calls and text messages about firearm sales. (*Id.* ¶ 5, 23–7).

On June 7, 2023, Mr. Alsenat sold two firearms—a Taurus PT111 G2 9mm handgun, and a Cobray/FMJ PM11 9mm pistol—as well as a

barrel extension to the undercover. (*Id.* ¶ 5).

On June 21, 2023, Mr. Alsenat sold three machine gun conversion devices ("MCDs") to the undercover. (*Id.* ¶ 6). During and after the sale, Mr. Alsenat showed the undercover how to install the MCDs onto a semi-automatic gun and explained that the MCDs would turn a semiautomatic gun into a fully automatic machine gun. (*Id.*).

Mr. Alsenat was ultimately charged by indictment with one count of possession of a machinegun. (DE 3). More specifically, the indictment charged that he:

> knowingly possessed a machinegun, as defined in Title 18, United States Code, Section 921(a)(24) and Title 26, United States Code, Section 5845(b), in that the defendant possessed a machinegun conversion device, a part designed and intended solely and exclusively, and a combination of parts designed and intended, for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, in violation of Title 18, United States Code, Section 922(o)(l).

(*Id.* at 1).

The language of the indictment tracks the statutory definition of "machinegun" in 26 U.S.C. § 5845(b) of the National Firearms Act, which is referenced in 18 U.S.C. § 921(a)(24). The statute provides:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function

3

of the trigger. **The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,** and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. 5845(b) (emphasis added).

Accordingly, under federal law, Mr. Alsenat's alleged possession of a conversion device constituted possession of a machinegun.

<u>Motion to Dismiss</u>

In the district court, Mr. Alsenat moved to dismiss the indictment as facially unconstitutional under the new two-step Second Amendment methodology set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); or at least unconstitutional as applied to him. (DE 35).

In his motion, Mr. Alsenat noted that *Bruen*, in rejecting means-ends scrutiny, announced a new two-step test for assessing the constitutionality of firearm restrictions. (*Id.* at 2). Under that test, at Step One of the analysis, the Court asks only whether "the Second Amendment's plain text covers an individual's conduct." (*Id.*, citing 597 U.S. at 17). And if it does, "the Constitution presumptively protects that

conduct," and the burden falls on the government at Step Two to justify its regulation by "demonstrat[ing] that [it] is consistent with this Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." (*Id*. at 2, citing 597 U.S. at 37). Where the government cannot meet its burden, the regulation on protected conduct cannot stand. (*Id*., citing 597 U.S. at 26).

Here, Mr. Alsenat argued, § 922(o)(1) failed both steps of *Bruen*. (*Id*. at 2–8). As to the plain text, the Second Amendment guarantees the right (1) "of the people," (2) "to keep and bear," (3) "arms." *District of Columbia v. Heller*, 554 U.S. 570, 579–95 (2008).

Mr. Alsenat argued that, as a citizen and lifelong resident of the United States with no prior felony convictions, he is one of "the people" protected by the Second Amendment. (*Id*. at 4). Moreover, the Supreme Court in *Heller* recognized that to "keep" means to "retain in one's power or possession," and to "bear" means to "carry." 554 U.S. at 583–84. Coupled with the Court's holding in *Bruen*, 597 U.S. at 32—which made clear that the Second Amendment does not distinguish between home and public possession—Mr. Alsenat argued that his possession of a machine gun outside the home fell within the right to "bear" arms. (*Id*. at

5

5). Lastly, because "arms" refers to "[w]eapons of offence, or armour of defense," *Heller*, 554 U.S. at 581, he argued that a machine gun, as charged in the indictment, qualified as an "arm." (DE 35 at 5).

Thus Mr. Alsenat argued, his conduct was presumptively protected by the Second Amendment. (*Id.* at 5).

Under *Bruen*, the burden therefore shifted to the government at Step Two of the analysis to show that § 922(o)(1)'s restriction on that conduct was "consistent with the Nation's historical tradition of firearm regulation." (*Id.* at 6, citing *Bruen*, 597 U.S. at 17). And here, Mr. Alsenat argued, the government could not meet that burden as to § 922(o)(1) generally, or as applied to him in particular, an individual with no prior felony convictions who merely possessed a firearm. (*Id.* at 6–8).

The district court referred the motion to dismiss to the magistrate judge for a report and recommendation. (DE 38).

In its response, the government argued at Step One that the Second Amendment's text does not cover possession of machine guns because its protections apply only to weapons "in common use for lawful purposes." (DE 45 at 3). The government pointed to no specific textual language or feature to support this claim, instead asserting that machine guns have

been "categorically" deemed "dangerous and unusual weapons" and thus fall outside Second Amendment protections. (*Id.*). The government acknowledged that this Court has never held machine guns to be "dangerous and unusual" or outside the Second Amendment's scope, and instead relied on out-of-circuit, pre-*Bruen* precedent and several district court decisions reaching those conclusions. (*Id.* at 4). Then, relying on *United States v. Miller*, 307 U.S. 174 (1939) and *District of Columbia v. Heller*, 554 U.S. 570 (2008), asserted that machine guns are "categorically" considered "dangerous and unusual," not "in common use for lawful purposes," and thus exempt from Second Amendment protection. (*Id.* at 2 –3).

At Step Two, the government first cited a single colonial-era law from East New Jersey prohibiting the concealed carry of "unusual and unlawful weapons." (*Id.*). It also pointed to statutes from two colonies and four early states that authorized the arrest or disarmament of individuals who went armed in a manner likely to provoke fear or public disorder—such as affrayers, rioters, or other disturbers of the peace. (*Id.* at 5–6). The government conceded, however, that these statutes required "'something more'" than mere public carry and did not prohibit

7

simple possession of any weapon. (*Id.* at 6, citing *Bruen*, 597 U.S. at 50).

The government next attempted to analogize machine guns to other weapons such as Bowie knives, slungshots, brass knuckles, and billy clubs—arguing that each had been banned in at least one jurisdiction. (DE 45 at 6–7). But it offered no reasoning as to why those weapons are meaningfully comparable to machine guns or how such comparisons satisfy *Bruen*'s historical standard.

As for machine guns themselves, the government relied on post-World War I state laws enacted in response to criminal misuse of weapons like the Thompson submachine gun. (*Id.* at 7). However, it offered no meaningful analysis of those laws—their scope, burden, or application—and did not explain how they comport with *Bruen*'s requirement for a historical analogue that is relevantly similar in both purpose and effect.

As to Mr. Alsenat's as-applied challenge, the government failed to identify any founding-era analogue supporting the disarmament of individuals like him—citizens with no felony convictions. Instead, it relied on broad, categorical restrictions and regulations concerning modes of carry, without addressing whether a complete ban on mere

possession by someone in Mr. Alsenat's position can be historically justified. In doing so, the government effectively disregarded the individualized nature of Mr. Alsenat's challenge and failed to rebut the presumption of constitutional protection that arises once the plain text is satisfied.

In reply, Mr. Alsenat explained that the government's reliance on *Miller* and *Heller* for the proposition that machine guns are categorically "dangerous and unusual weapons" was misplaced, as neither case addressed machine gun prohibitions and the government's argument relied on dicta. Citing certain statistics, Mr. Alsenat also disputed that machine guns are "dangerous and unusual weapons" and not "in common use for lawful purposes." In addition, he argued that the historical statutes cited by the government regulated the manner of carrying "dangerous and unusual weapons"—such as concealed carry or conduct likely to cause affray or public fear—but did not prohibit mere possession. Finally, Mr. Alsenat emphasized that the government failed to offer any historical analog supporting a categorical ban on possession by individuals like himself, who have no prior felony convictions.

On March 25, 2024, the magistrate judge issued a Report and

Recommendation recommending that Mr. Alsenat's motion to dismiss be denied. (DE 48). The magistrate judge concluded that the Second Amendment does not protect the possession of a machine gun, citing, similar to the government, pre-*Bruen*, out-of-circuit decisions that had reached similar conclusions. The Report characterized machine guns as "dangerous and unusual" and "not in common use at the time."

Mr. Alsenat filed objections to the R&R, specifically objecting to the magistrate judge's conclusions: That the Second Amendment does not protect the possession of a machine gun; That machine guns fall within a class of "dangerous and unusual" weapons; That machine guns are not "in common use"; That the statute at issue is consistent with a historical tradition of regulating "dangerous and unusual" weapons and/or machine guns. (DE 59 at 1–2).

On April 22, 2024, the district court held a status conference with the parties. (DE 57).

The district court initially voiced its intention to set the matter for an evidentiary hearing, noting the novelty of the issue, DE 98 at 4:7–9, and expressing a preference to hear from "actual historians," *id.* at 4:3— and potentially to appoint a court expert. (*Id.* at 4:11-14). Ultimately,

however, the court reversed course, set no evidentiary hearing, and instead held a second status conference at which it heard argument from the parties. (DE 65). At the conclusion of that status conference, the court indicated it would deny the motion to dismiss. (*Id.*). In its subsequent written order, the district court adopted the Report and Recommendation and, writing separately, concluded that machine guns are not protected under the Second Amendment because they are "not in common use" and are "dangerous and unusual." (DE 66 at 2). The court further found that machine gun conversion devices (MCDs), although it meets the statutory definition of a "machine gun," does not qualify as "Arms" under the Second Amendment and therefore are not entitled to constitutional protection. (*Id.* at 2). Rather the district court found MCD akin to an "accessory" or "accoutrement." (*Id.* at 18–20). Having found the Second Amendment's plain text inapplicable, the court declined to undertake the historical inquiry required at Step Two of *Bruen*.

Plea of Guilty

With the denial of his motion, Mr. Alsenat chose to enter a plea and appeal his constitutional challenges to this Court.

On June 12, 2024, Mr. Alsenat entered a plea of guilty to the sole

11

count. (DE 71). On November 26, 2024, the district court sentenced him to 24 months imprisonment, followed by 3 years supervised release (DE 87). He filed a timely notice of appeal. (DE 89).

## Standards of Review

The constitutionality of a criminal statute is reviewed de novo. *United States v. Fleury*, 20 F.4th 1353, 1362 (11th Cir. 2021).

## SUMMARY OF THE ARGUMENT

The Court should vacate Mr. Alsenat's conviction because 18 U.S.C. § 922(o)(1) is unconstitutional both facially and as applied to him, according to a strict application of the two-part, "text and history" test announced in *New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that the challenged regulation is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17.

Mr. Alsenat's conduct—mere possession of a machine gun—falls within the Second Amendment's plain text. Because Step One is satisfied, *Bruen* shifts the burden to the government at Step Two to justify the regulation by pointing to a historical tradition that is either distinctly or relevantly similar, widespread, and rooted in the Founding era.

Section 922(o)(1), however, imposes a categorical ban on machine gun possession regardless of context—irrespective of how the possessor uses or displays the gun—and the government failed to identify any

comparable historical analogue—particularly one that would support disarming individuals like Mr. Alsenat, who has no felony convictions.

Accordingly, Mr. Alsenat's conviction must be vacated. See *United States v. Morgan*, No. 23-CR-10047 (D. Kan. Aug. 21, 2024) (granting as-applied challenge to § 922(o)(1)); *United States v. Brown*, No. 3-CR-123 23-cr-123 (S.D. Miss. Jan. 29, 2025) (granting as-applied challenge to defendant facing 922(o)(1) prosecution).

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.The Court should vacate Mr. Alsenat's conviction because, after *Bruen*, 18 U.S.C. §922(o)(1) violates the Second Amendment ~~as applied to him~~**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that based on the text of the Second Amendment and history, the amendment "conferred an individual right" "to possess and carry weapons in case of confrontation." *Id.* at 576, 582, 592-95. But it was only in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), that the Supreme Court set forth a "test" for deciding the constitutionality of all firearm regulations.

At Step One of *Bruen*'s Second Amendment test, courts may consider *only* whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If it does, *Bruen* held, "the Constitution presumptively protects that conduct." *Id.* And, regulating presumptively protected conduct is unconstitutional unless the government, at Step Two of the analysis, can "justify its regulation by

16

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Id*. at 37.

**A.** ***Bruen* Step One: The Second Amendment's "plain text" protects Mr. Alsenat's possession of a machinegun outside the home**

Applying *Bruen's* newly-defined first step for Second Amendment analysis, 597 U.S. at 17, the Court should hold that the Second Amendment's "plain text" covers Mr. Alsenat and his conduct. The Second Amendment's operative clause contains only three elements, guaranteeing the right (1) "of the people," (2) "to keep and bear," (3) "arms." *Heller*, 554 U.S. at 579- 95. Mr. Alsenat and his conduct fall squarely within each of these elements.

As an initial matter, there is no dispute—nor could there be—that Mr. Alsenat qualifies as one of "the people" under the first step of *Bruen*. As an American citizen with deep and continuous connections to the country, DE 88 ¶ 36–40, he is clearly among those protected by the Second Amendment. *See Heller*, 554 U.S. at 581 ("We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans"). Moreover, Mr. Alsenat has

no prior felony convictions and there is no separate basis to exclude him from "the people" whom the Second Amendment protects.

As to the phrase "to keep and bear," *Heller* makes clear that "keep" means to "have" or "retain in one's power or possession" and "bear" means to carry. 554 U.S. at 583–84. Mr. Alsenat was charged with knowingly possessing a machine gun, conduct that plainly falls within the scope of both terms. And as *Bruen* reaffirmed, the Second Amendment protects possession both in the home and in public. Thus, his knowing possession, regardless of location, falls within the plain text of the Second Amendment.

Finally, turning to the term "arms." Here, again, the plain text of the Second Amendment is satisfied. In *Heller*, the Supreme Court explicitly defined "arms" to mean "weapons of offence, or armour of defence," as well as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581. That definition, the Court explained, reflected the 18th-century understanding of "arms"—a meaning that remains consistent today. The Court further explained that this definition includes all bearable weapons, even those not in existence at the time of the founding. *Id.* at

582. A weapon is thus an "arm" if it is capable of being carried and used for offensive or defensive purposes.

A machine gun plainly qualifies as an "arm" under that definition. Both in ordinary language and by statutory definition, a machine gun is a weapon. In common usage, a machine gun is universally understood to be a type of gun—and a gun to be a weapon. The term "machine gun" is defined under federal law, in relevant part, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24). Because a machine gun is a bearable firearm—designed for sustained fire in both offensive and defensive contexts—it falls squarely within the Second Amendment's protection as an "arm."

Here, the indictment charged Mr. Alsenat with possessing a machine gun "in that" he possessed a machine gun conversion device. (DE 3). The result is the same. That is because, under federal law, a machine gun conversion device *is* a machine gun. 26 U.S.C. § 5845(b) ("[t]he term 'machine gun' ... shall also include ... any part designed and intended solely and exclusively, or combination of parts designed and intended, for

19

use in converting a weapon into a machinegun." Building on that, the indictment alleged that the machinegun conversion device at issue was in fact "a part designed and intended solely and exclusively, and a combination of parts designed and intended, for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." Accordingly, in possessing the machine gun conversion device, he possessed a machine gun.

The government agrees. *See* DE 3, Indictment (listing the sole count as "Possession of a Machinegun"); Det. Hrg. Tr. Nov. 30, 2023 at 4:3-- ("on June 21st, the Defendant sold three machine guns, basically Glock switches, to the undercover"); DE 45 at 2–9 (referring to Mr. Alsenat's possession of a "machine gun" as falling outside Second Amendment protection); DE 72, Factual Proffer ("The MCDs qualify as machine guns [under federal law].").

Because a machinegun is a weapon of offense or defense or both— and thus an "arm"—and because a machinegun conversion device is, under federal law, a machinegun, it follows that a machinegun conversion device is an "arm" within the meaning of the Second Amendment.

The district court's finding in the alternative—that MCDs are merely "accessories" or "accoutrements"—is incorrect. Unlike a silencer or a large-capacity magazine, analogized to by the district court, a machine gun conversion device is not an optional add-on or peripheral attachment. It is a functional component that enables a firearm to discharge automatically—thereby transforming it into a machine gun. In that respect, an MCD is not external to the weapon's classification; it is what makes the weapon a machine gun in the first place. Without it, the firearm is not a machine gun; with it, it is. The device is thus not ornamental or auxiliary, but integral—comparable in function to ammunition, a firing mechanism, or the trigger itself.

Even if the court's analogy to a silencer were accepted, it is worth noting that this area of law remains unsettled. In *United States v. Peterson*, No. 24-30043 (5th Cir. 2025), the Fifth Circuit initially held that suppressors were not "arms" under the Second Amendment, but later withdrew its panel opinion. This reflects the evolving and contested nature of how courts evaluate firearm components post *Bruen*.

In sum, machine guns—and by extension, MCDs—fall within the core category of bearable weapons recognized by *Heller* and *Bruen*. *Heller*

explained that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. *Bruen* reaffirmed that this protection includes "modern instruments that facilitate armed self-defense." 597 U.S. at 28. An MCD is precisely that kind of instrument.

**B. *Bruen* Step Two: There is no historical tradition of firearm regulation in this country that would justify categorical prohibition of mere possession of a machine gun, whether generally or as to Mr. Alsenat**

Where, as here, an individual's conduct is shown to be presumptively protected by the plain text of the Second Amendment, a restriction can only stand where the Government shows that such a restriction "is consistent with the Nation's historical tradition of firearm regulation," that is, the tradition in existence "when the Bill of Rights was adopted in 1791." Bruen, 597 U.S. at 37.

Here, the government failed to provide a relevantly similar historical analogue to show that § 922(o)(1) is deeply rooted in this National's historical tradition of firearm regulation generally, or as applied to Mr. Alsenat. Whatsmore, the district court believing machine

guns to be outside of second amendment protection declined to conduct second step of bruen analysis.

### 1. The Government bears the burden of showing a tradition.

*Bruen* outlined two paths for conducting the required historical inquiry for regulations of presumptively protected conduct. First, where a statute is directed at a "longstanding" problem that "has persisted since the 18th century," Bruen directs a "straightforward" inquiry: if there is no historical tradition of "distinctly similar" regulation, the regulation at issue is unconstitutional. Id. at 26-28 (conducting this "straightforward" inquiry to strike down New York's restriction on public carry of guns). Second, where a statute is directed at "unprecedented societal concerns or dramatic technological changes," or problems that "were unimaginable at the founding," then and only then are courts empowered to reason "by analogy." Id. at 2132.

In assessing, whether the Government has met its burden to "establish the relevant tradition of regulation," this Court must apply four principles. *Bruen*, 597 U.S. at 58 n.25. *First*, where, a challenged regulation addresses a general societal problem that has persisted since

the 18th century, that regulation is unconstitutional unless the Government shows a tradition of "distinctly similar historical regulation" since that time. *Id.* at 26. *Second*, to establish a true "*tradition*" of "distinctly similar historical regulation," the government must show that the same type of regulation was prevalent in the country at the Founding, and that the firearm regulation(s) on which it relies are "well-established and representative." "[A] single law in a single State" is not enough; instead, a "widespread" historical practice "broadly prohibiting" the conduct in question is required. *Id.* at 36, 38, 46, 65 (expressing doubt that regulations in even *three* of the thirteen colonies "could suffice.").

*Third*, a "*longstanding*" tradition is required, and that accounts for time. Per *Bruen,* "when it comes to interpreting the Constitution, not all history is created equal" because "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," which in the case of the Second Amendment, was in 1791. *Id.* at 34. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. As the historical evidence moves past 1791, the less probative it becomes.

24

*Finally*, the government "bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 25, n. 6. They "are not obliged to sift the historical materials for evidence to sustain [a] statute. *Id.* at 60. If "history [is] ambiguous at best," the statute is unconstitutional. *Id.* at 39-40.

In short, to meet the *Bruen* Step Two inquiry, the government must affirmatively present evidence of historical regulation "distinctly similar" to § 922(o)(1) that was sufficiently prevalent, dates to the Founding, and applied specifically to those like Mr. Alsenat, with no prior convictions. As is further described below, the government cannot show a longstanding tradition of distinctly similar regulation here.

### 2. The Government did not and cannot meet its burden of establishing a sufficient historical analog

The government has failed to identify any historical analogue— distinctly or even relevantly similar—to support the constitutionality of § 922(o)(1). It has not shown that this categorical prohibition on mere

possession of a machine gun is consistent with the Nation's historical tradition of firearm regulation.

As described above, in the district court, the government first relied on early "going armed" statutes derived from English common law and adopted in some antebellum American jurisdictions. But these statutes are no analog. They targeted specific conduct—namely, the public carrying of weapons "in such a manner as will naturally cause terror to the people." *Bruen*, 597 U.S. at 51 (quoting *Simpson v. State*, 13 Tenn. 356, 361 (1833)); see also *Rahimi*, 602 U.S. at 697 (quoting 4 Blackstone, *Commentaries* 149 (1769)). These laws prohibited carrying dangerous or unusual weapons with intent to alarm or intimidate, but they did not ban possession of weapons in general.

Section 922(o), by contrast, imposes a blanket prohibition on simple possession of machine guns, regardless of context. It contains no requirement that the firearm be displayed, brandished, or used in a threatening manner. As the court in *United States v. Morgan*, 2024 WL 3936767, at *4, observed: "[i]f an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without touching it, he is just as guilty of a violation of § 922(o) as one who takes

26

the same weapon out on the public streets and displays it in an aggressive manner." A regulation this sweeping—covering all possession, in any context—does not resemble the historical tradition reflected in going-armed laws.

The government also cited 19th-century laws regulating items such as Bowie knives, blunt weapons, brass knuckles, and billy clubs. It argued that some unspecified number of states banned these items but offered no meaningful analysis to support their relevance here. The government provided no explanation as to why a machine gun—a highly regulated, operable firearm—should be treated analogously to these melee weapons. It failed to offer any discussion of the functional similarities (or differences) between such items and machine guns, how or why they were banned, or whether those laws were widely adopted or limited in scope. Nor did it address whether the bans imposed comparable burdens on the right to armed self-defense. In short, the government left the task of historical analogy entirely to the Court, contrary to *Bruen*'s clear instruction that the government bears the burden of establishing a historical tradition. *Bruen*, 597 U.S. at 19, 25 n.6, 60.

Finally, the government relied on 20th-century machine gun regulations, but again, it failed to provide any meaningful analysis. It did not explain the nature or scope of those laws, to whom they applied, what conduct they prohibited, what penalties were imposed, or whether any exceptions existed. Nor did it demonstrate how those laws are "distinctly" or "relevantly" similar to § 922(o)(1). Under *Bruen*, courts must consider not just the existence of earlier regulations, but "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The government offered no such reasoning.

Given this historical record, the government cannot show a historical tradition of gun regulation "distinctly similar" to § 922(o)(1). And even *if* the government *were* permitted to reason "by analogy" under the more forgiving "relevantly similar" standard, it still could not meet its burden because there is no consistent historical tradition of **any** analogous regulation that was *not only* "comparably justified" to § 922(o)(1), *but also* posed a "comparable burden" (***complete prohibition***), as *Bruen* requires to uphold any firearm prohibition as constitutional under the "relevantly similar" standard. 597 U.S. at 28-29.

28

But notably, this Court need not reach so far to resolve the as applied issue in this appeal.

### 3. All the Court needs to find here is that there is no historical tradition of categorically disarming individuals *like Mr. Alsenat*

In a facial challenge, the defendant must prove there is no set of circumstances in which the law could be applied in a constitutional manner. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *United States v. Pugh*, 90 F.4th 1318, 1325 (11th Cir. 2024). By contrast, in an as applied challenge, a defendant seeks only to vindicate his constitutional rights. Therefore, the Court need only determine whether a statute is unconstitutional on the facts of a particular case or in its application to a particular defendant. *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022).

The as-applied issue in this case can be easily disposed of with a case-specific ruling that there is no historical tradition to support application of § 922(o)(1) to Mr. Alsenat, an adult citizen who has no felony convictions who merely possessed a machinegun, the right covered by the Second Amendment. There is no tradition in this country to

support a categorical ban on the mere possession of such a firearm by a non-felon citizen. Thus the statute is unconstitutional as applied to him.

## II.  18 U.S.C. § 922(o)(1) is facially unconstitutional.

For many of the same reasons explained above, § 922(o)(1) is facially unconstitutional. Machineguns are protected by the text of the Second Amendment because they are commonly used by citizens for a lawful purpose. The government has also failed to show that § 922(o)(1) is consistent with this Nation's historical tradition of firearm regulation.

## CONCLUSION

The Court should vacate Mr. Alsenat's conviction.

HECTOR A. DOPICO
FEDERAL PUBLIC DEFENDER

*/s/ Eboni Blenman*
Eboni Blenman
Assistant Federal Public Defender
150 West Flagler Street, Suite 1700
Miami, Florida 33130
Telephone No. (305) 530-7000

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 32(a)(7)(B), because it contains 5, 282 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook font.

*/s/Eboni Blenman*
Eboni Blenman

## CERTIFICATE OF SERVICE

I HEREBY certify that on this date, July 18, 2025 , I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via CM/ECF on [*Name of AUSA assigned to case] and on Daniel Matzkin, Chief Appellate Division, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/Eboni Blenman*
Eboni Blenman